UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

TAMARA L. COUICK,

Plaintiff,

v.     4:10-cv-153

EFFINGHAM COUNTY HOSPITAL AUTHORITY d/b/a EFFINGHAM HOSPITAL,

Defendant.

### ORDER

### I. INTRODUCTION

Plaintiff Tamara Couick ("Couick") filed the instant action against Defendant Effingham County Hospital Authority ("Effingham Hospital") on June 25, 2010. *See* Doc. 1. Plaintiff asserted claims under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"), for denying her leave (Count I) and then firing her (Count II). The Court dismissed Count I for Couick's failure to abide by the FMLA's notice requirements. *See* Doc. 32 at 3. Plaintiff also alleges state law claims of intentional infliction of emotional distress ("IIED") (Count III) and negligent supervision and retention of her superiors (Count IV). *See* Doc. 1.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment, *see* Doc. 34, and Defendant's Motion for Summary Judgment, *see* Doc. 39.

### II. FACTS

#### A. The Cast

Couick began working at Effingham Hospital on December 21, 2006. *See* Doc. 42-2 at 48 (Couick Dep.). Couick reported to Registration Coordinator Lydia Kaye Barrs ("Barrs"), *see* Doc. 39-14 at 1-2 (Vicky Little Affidavit), who in turn reported to Business Services Manager Beverly Kicklighter ("Kicklighter"), *see* Doc. 42-2 at 53 (Couick Dep.). Kicklighter reported to Chief Financial Officer Edward Brown ("Brown"). *See* Doc. 42-3 at 3 (Norma Jean Morgan Dep.). Brown reported to Chief Executive Officer Norma Jean Morgan ("Morgan"). *See id.* The Hospital also employed Marie Livingstone ("Livingstone"), in-house legal counsel, and Vicky Little ("Little"), Director of Human Resources during this time. *See* Docs. 42-2 at 85 (Couick Dep.); 39-12 at 3 (Livingstone Dep.).

#### B. March 2009

Couick went to Dr. James Cornwell Jr., M.D.'s ("Dr. Cornwell") office on Friday, March 6, 2009. *See* Doc. 42-2 at 88-89 (Couick Dep.). Dr. Cornwell diagnosed her with sinusitis and an upper respiratory infection and prescribed antibiotics. *See id.* at 88. Couick reported her condition to Barrs and Kicklighter that day. *See id.* at 88-89. Barrs allowed Couick to go home early. *See id.* Couick did not give Barrs her keys before leaving. *See id.* at 139.

Couick worked all day Monday. *See id.* at 102. But on Tuesday, March 10, 2009, she again reported to Barrs that she was too ill to work. *See id.* at 88. At 8:15 a.m., Couick told Barrs that she still felt sick, her

antibiotics were not working, and Dr. Cornwell thought she had the flu. *See id.* at 91. Barrs told her that she would try to find a replacement for Couick and get back to her about leaving work. *See id.*

Couick called Barrs back at 10:30 a.m. and asked permission to leave work. *See id.* at 92. Specifically Couick said, "I cannot do that; I cannot stay at work, I am so sick, I have to go home." *See id.* Barrs denied her request. *See id.* Barrs told Couick that because she had already let one employee go to take care of a child, Couick would have to "suck it up." *See id.*

By 11:45 a.m., Couick felt that she could not continue to work in her condition and went to see Barrs. *See id.* at 141-42. For purposes of this motion, Effingham Hospital accepts the following portion of Couick's account of what happened next. *See* Doc. 42 at 6 n.4.

> I walked over to the hospital to Ms. Barrs' office, handed her my keys which had my badge attached to it and told her she was going to need them, that I was sick, I was done, I was going home.
>
> Q: Then what happened?
>
> A: Then I left.
>
> Q: Then what happened?
>
> A: I walked to the business office. I was in tears. At that point Lisa Lopez's car was broke so she was riding back and forth with me to work. I told her she was going to have to find a ride home, that I was sick and I was going home.
>
> …
>
> A: Lisa Lopez and Katrina Martin asked me where my lariat was that I normally wore around my neck that had my badge and keys connected to them. I told the -- I told them both that I had left it with Ms. Barrs. And then I walked out of the front door of the hospital.
>
> Q: Where did you go?
>
> A: I went to my car. On the way to my car I saw Darleen Mock, Deanne Jarmin and Janice.
>
> …
>
> A: Yes. They asked me what was going on because I was in tears. I told them I was terribly ill. Once again [Barrs] had denied me coverage. And that I was sick and I was going home.
>
> …
>
> A: That was -- that was not the last of mine and Ms. Barrs' conversation. I told her she was going to need the keys, that I was sick. I was done. I was going home. She looked at me and she said, does this mean what I think it means. And I said, yes, ma'am, it means I'm sick, I'm done, I'm going home. She asked me if I cleared it through Ms. Kicklighter. And I looked at her and said no, you're my direct report. And then I left.

Doc. 42-2 at 142-44. This was the first time Couick ever handed over her badge. *See id.* at 206. After Couick's friend Katrina Martin ("Martin") spoke with Couick, she "understood [Couick] had quit her job." *See* Doc. 39-10 at 2 (Martin Affidavit).

2

Barrs then proceeded to Little's office. Barrs handed Little Couick's keys, badge, and lanyard and reported that Couick said, "I'm out of here." *See* Doc. 39-4 at 4-5 (Little Dep.). Barrs also said that she believed she heard Couick say she quit. *See id*. Darlene Mock ("Mock"), another Effingham Hospital employee, then came into Little's office. *See id.* at 5. Mock said that she had just seen Couick in tears and that Couick told her that she had just quit. *See id.*; Doc. 39-8 at 20-21 (Mock Dep.) ("She said, 'I quit, I turned in my keys and my badge to my immediate supervisor. . . my health is more important than this job.'").

Little then met up with Kicklighter and the two proceeded to Livingstone's office. *See* Doc. 39-4 at 6-7 (Little Dep.). Little recounted what Barrs and Mock had told her, but without naming Couick. *See id.* at 7. Livingstone opined that the unnamed employee had just quit. *See id.* The group then repeated the story to Morgan. *See id.* Morgan agreed that Couick quit. She said that this time it stands, referencing Couick's three previous resignations followed by rescissions. *See id.*

In November 2007, Couick sent a letter of resignation to her superior. *See* Doc. 42-4 at 1. Four and a half hours later, she rescinded. *See id.* at 3. Couick resigned again three to six months after being promoted to her latest position. *See* Doc. 42-2 at 74 (Couick Dep.). Couick rescinded after Morgan and Kicklighter gave her the opportunity to reconsider. *See id.* at 75. Couick quit a third time a little over a month before the events giving rise to this suit. *See* Doc. 46 at 2 (Plaintiff's Response to Defendant's Statement of Material Facts). Couick wrote a note to Kicklighter resigning her position effective January 28, 2009. *See id*.

On Wednesday, March 11, 2009, Couick and her husband came into the hospital to deliver a note from Dr. Cornwell's office stating that Couick was ill and would be unable to return to work until Monday, March 16. *See* Docs. 39-4 at 8 (Little Dep.), 1-4 (Note). Little was "astonished, astounded, surprised" because she thought Couick had quit. *See* 39-4 at 8 (Little Dep.). Little took the note to Livingstone's office to discuss what to make of it. *See id.* at 9. Livingstone was equally surprised. *See id*.

On Friday, March 13, 2009, Little called Couick to ask her to come in to discuss Tuesday's events. *See* Doc. 42-2 at 103 (Couick Dep.). Little told Couick about everyone's surprise that she brought a doctor's note after resigning. *See* 39-4 at 11. (Little Dep.). Couick denied that she resigned. *See id.* Little then met with Morgan and Livingstone. *See id.* at 12-13. They decided to call Couick to "give an update." *See id* at 13.

Little called Couick on Sunday, March 15, 2009, to tell her that Effingham Hospital's position was that she quit and it would not be accepting her fourth rescission of a resignation. *See id*.

### C. Unemployment Benefits

Couick applied for unemployment insurance benefits. *See* Doc. 35-2 (Georgia Department of Labor ("DOL") Claims Examiner's Determination). The claims examiner denied her claim on the basis that she had voluntarily resigned. *See id*.

3

Couick appealed. *See* Doc. 35-3 (Georgia DOL Appellate Decision ("Decision")). On August 21, 2009, the DOL Administrative Hearing Officer ("DOL Officer") held an evidentiary hearing on the issue of whether Couick resigned her position. *See* Doc. 35-4 at 2. The DOL Officer determined that Couick had not resigned and was eligible for unemployment benefits. *See id.*

Effingham Hospital appealed this ruling to the DOL Board of Review. *See* Doc. 35-7 (Acknowledgement of Appeal to the Board of Review). But Effingham Hospital later withdrew this appeal. *See* Doc. 35-8 (letter from Defendant's counsel). This dispute was never heard by a superior court.

### D. Emotional Distress

Couick sent a formal complaint to Kicklighter about Barrs in February 2009. *See* Doc. 42-2 at 116 (Couick Dep.). In response, Kicklighter met with Barrs and Couick almost immediately after receiving the complaint. *See id.* at 171. This meeting ended with Couick asking Barrs for a hug. *See id.* at 174.

In her deposition, Couick testified that she bases her IIED claim on Barrs: (1) denying her FMLA leave request, (2) berating Couick three times about paid time off issues, (3) leaving Couick off a list for ordering jackets, (4) sending one or two emails in "all caps," (5) failing to notify Couick of educational courses, and (6) asking Couick, "do you not know how to spell my name?" *See* Doc. 42-2 at 168-70 (Couick Dep.).

### III. STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56 also now explicitly recognizes that partial summary judgment is available when this is true of only part of a claim or defense. *See id.* In ruling on summary judgment, the Court views the facts and inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437 (11th Cir. 1991).

"The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party then "may not rest upon the mere allegations or denials of [his] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if

4

it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

### IV. PLAINTIFF'S MOTION

Couick moves the Court for partial summary judgment on the issue of whether Effingham Hospital terminated her employment. *See* Doc. 34. Couick contends that because a DOL Officer found that Effingham Hospital fired her, collateral estoppel precludes the defendant from re-litigating that issue in this case. *See id.*

"In considering whether to give preclusive effect to state *court* judgments, federal courts must apply that state's law of collateral estoppel." *Agripost, Inc. v. Miami-Dade Cnty., ex rel. Manager*, 195 F.3d 1225, 1229 n.7 (11th Cir. 1999) (emphasis added). The fact that a *state administrator's* judgment is involved here does not affect this Court's deference to state law. "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (internal citation and quotation omitted).

But under Georgia law, any finding by a DOL Officer "shall not be admissible, binding, or conclusive in any separate or subsequent action or proceeding between a person and such person's present or previous employer brought before any court . . ." O.C.G.A. § 34-8-122(b). The Georgia Court of Appeals has confirmed that this statute means that "dispositions by entities acting under the authority of the commissioner of labor have no preclusive effect in subsequent actions against the employer." *Langton v. Dep't of Corrs.*, 220 Ga. App. 445, 446 (1996).

Georgia law does give preclusive effect to a *judicial decision* based on administrative benefit hearings. *See Shields v. Bellsouth Adver. & Publ'g Corp.*, 273 Ga. 774, 778 (2001); *Langton*, 220 Ga. App. at 445. Couick argues that this distinction is illogical and vests the losing party before the DOL Officer with the authority to deprive that decision of preclusive effect by not appealing to the superior court. *See* Doc. 45 at 3-4. This argument gets Couick nowhere. This Court does not sit in judgment of the wisdom of Georgia's laws. *See Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

The DOL Officer's finding does not affect this case because it has no preclusive effect under Georgia law. *See* O.C.G.A. § 34-8-122(b). Couick's motion for partial summary judgment, *see* Doc. 34, is **DENIED**.

### V. DEFENDANT'S MOTION

Effingham Hospital moves for summary judgment on Couick's remaining claims in Counts II, III, and IV.

#### A. FMLA Retaliation

"Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, we apply the burden shifting framework established by the Supreme Court in

5

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Couick must first establish a prima facie case. *See id.* "[T]he burden then shifts to [Effingham Hospital] to articulate a legitimate reason for the adverse action. If [Effingham Hospital] does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

### 1. Prima Facie Case

To establish her prima facie case, Couick must show that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity. *Id.* at 1297; *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001).

A genuine issue of fact exists over whether Couick established this prima facie case. A reasonable jury could find that she suffered an adverse employment decision. *Hurlbert*, 439 F.3d at 1297. Effingham Hospital told Couick that it was accepting her resignation on Sunday, March 15, 2009. *See* 39-4 at 11-12 (Little Dep.). Couick contends that this was a termination because her Tuesday, March 10 conduct was not a resignation. *See* Doc. 47 at 13. For purposes of this motion Effingham Hospital accepts that Couick did not say she quit. *See* Doc. 42 at 6 n.4. Nonetheless, Effingham Hospital presents compelling evidence that she did tell her co-workers that she quit, *see* Doc. 39-8 at 20-21 (Mock Dep.), and that her actions led even her friends to believe she quit, *see* Doc. 39-10 (Martin Affidavit).

Couick contends that she instead went home to convalesce and only turned in her keys because the hospital would need them—and her badge because it was attached to the keys. *See* Doc. 42-2 at 143-45 (Couick Dep.).

Given Couick's version of what she told Barrs and her coworkers, a reasonable jury could find that Couick did not resign. *See also United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437 (11th Cir. 1991). Therefore, a genuine issue of fact exists over whether Effingham Hospital fired Couick on Sunday, March 15, 2009—and, in turn, whether Couick established her prima facie case.

### 2. Reason for Alleged Adverse Action

Even though a genuine issue of fact exists over whether Couick established a prima facie case, it is not material—and does not preclude summary judgment—if Effingham Hospital articulated a legitimate reason for separating Couick and she fails to show that reason is pretextual. *See Hurlbert*, 439 F.3d at 1297 (discussing burden shifting framework); *Anderson*, 477 U.S. at 248 (facts not affecting outcome immaterial).

#### a. Effingham Hospital's legitimate, nondiscriminatory, reason

Assuming a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged action. *See Hurlbert*, 439 F.3d at 1297; *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (discussing Title VII discrimination).

6

This burden is only one of production though. "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Combs*, 106 F.3d at 1528 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (discussing Title VII discrimination)). But the defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful [retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505 (1993) (discussing Title VII discrimination).

Effingham Hospital told Couick that it considered her actions on March 10, 2009, a resignation. *See* 39-4 at 13 (Little Dep.). It argues that even if the Court finds that its position constituted an adverse employment decision, it had a legitimate reason for its stance. Effingham Hospital believed that she resigned. *See* Doc. 42 at 16.

Effingham Hospital showed that Couick handed over her badge for the first time on Tuesday, March 10, 2009, *see* Doc. 42-2 at 206 (Couick Dep.), and that Couick had rescinded three previous resignations from Effingham Hospital, *see* Docs. 42-4 at 1, 42-2 at 74 (Couick Dep.), 46 at 2 (Plaintiff's Response to Defendant's Statement of Material Facts). Barrs and Mock both reported hearing Couick say she quit. *See* Docs. 39-4 at 4-5 (Little Dep.); 39-8 at 20-21 (Mock Dep.) ("She said, 'I quit, I turned in my keys and my badge to my immediate supervisor. . . my health is more important than this job.'"). Little, Martin, Livingstone, and Morgan all thought that Couick had quit when they first heard what she did and said on Tuesday, March 10, 2009. *See* Docs. 39-4 at 7-8 (Little Dep.), 39-10 (Martin Affidavit).

"An employer's decision to reject an employee's rescission of her resignation is not an adverse employment action." *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1300 (M.D. Fla. 2002)). Effingham Hospital proffered a legitimate reason for its actions.

### b. Whether Effingham Hospital's Reason is Pretextual

Once the employer has proffered a legitimate reason for its actions, the employee "has the opportunity to discredit the defendant's proffered explanations for its decision." *See Combs*, 106 F.3d at 1528 (discussing Title VII discrimination). "[A] plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that *the reasons given by the employer were not the real reasons for the adverse employment decision*." *Hurlbert*, 439 F.3d at 1298 (emphasis added).

Couick alleges that Effingham Hospital's adverse employment decision was taking the position that she had quit. *See* Doc. 47 at 12-13. Effingham Hospital argues that its legitimate reason for telling Couick that it accepted her resignation was that it believed she resigned. *See* Doc. 42 at 16. To carry her burden, Couick must show that Effingham Hospital did not *subjectively* believe Couick resigned. *See Hurlbert*, 439 F.3d at 1298 ("the reasons given by the

7

employer were not the real reasons for the adverse employment decision").

Couick argues only that any such belief would be unreasonable. *See* Docs. 47 at 14-15, 55 at 3. Even accepting Couick's version of what she told Barrs and her coworkers on March 10, Effingham Hospital has shown that it believed Couick resigned. Her three previous resignations, combined with her actions on March 10, 2009, led Mock, Little, Martin, Livingstone, and Morgan all to conclude that Couick quit. *See* Docs. 39-4 at 7-8 (Little Dep.), 39-8 at 20-21 (Mock Dep.), 39-10 (Martin Affidavit).

Effingham Hospital came to this conclusion a day *before* Couick gave notice that her absence might be prolonged. *See* Docs. 39-4 at 8 (Little Dep.), 1-4 (Note). Effingham Hospital did not develop this belief to disguise a retaliatory motive to fire Couick for invoking her rights under the FMLA. Effingham Hospital believed that Couick had quit a fourth time.

The Eleventh Circuit has held that close temporal proximity between a request for FMLA leave and termination is evidence of pretext, "though probably insufficient to establish pretext by itself." *Hurlbert*, 439 F.3d at 1298. Here, this is especially insufficient where the employer's alleged adverse employment decision was based on a belief that the employee had just quit.

Couick argues that this decision results in an absurd paradox: Effingham Hospital "is not liable because it fired Couick based upon a belief she resigned." *See* Doc. 47 at 15. This result is not paradoxical. Even if Couick's actions were not in fact a resignation—making Effingham Hospital's actions a firing—the Defendant's belief that Couick resigned negates the inference that it retaliated against her for taking FMLA leave. Instead, Effingham Hospital took its position because "Couick had a tendency to get angry and quit . . . [a]nd this time Ms. Morgan said it stands." *See* Doc. 39-4 at 7 (Little Dep.). Couick failed to show that Effingham Hospital's position was pretext.

Effingham Hospital's motion for summary judgment, *see* Doc. 39, is **GRANTED** with respect to Couick's FMLA retaliation claim.

### B. IIED

In order to establish an IIED claim, Plaintiff must prove four elements: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; (3) the defendant's conduct caused emotional distress; and (4) the resulting emotional distress was severe." *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1557 (11th Cir. 1995) (applying Georgia law).

"Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for [IIED] is a question of law." *Yarbray v. S. Bell Tel. & Tel. Co.*, 261 Ga. 703, 706 (1991). Couick must show that Effingham Hospital's actions would lead an average member of the community to exclaim "Outrageous!," *see id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46(1) cmt. d (1991)), or that its conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized society," *Kaiser v. Tara Ford, Inc.*, 248 Ga. App. 481, 488 (2001).

But liability "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . . [P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt." *Kornegay v. Mundy*, 190 Ga. App. 433, 434-35 (1989) (internal quotations omitted). While the employment setting may heighten the danger of emotional distress, *see Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 230 (1985), termination alone, even if repugnant, cannot establish outrageous conduct without other allegations of abuse. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (applying Georgia law).

The plaintiff in *Anderson v. Chatham*, alleged that the defendant threatened her not to sue him or else she would "be sorry" and that he wouldn't give her a reference after he fired her. 190 Ga. App. 559, 566 (1989). The Court held that the plaintiff had sufficiently pled extreme and outrageous conduct because this otherwise insufficient threat came after a "pattern of abusive behavior." *See id.* at 567.

In *Jarrard v. UPS, Inc.*, a UPS supervisor smirked at an employee while he gave a stinging twenty minute performance review immediately following the employee's return from medical leave for psychiatric care. 242 Ga. App. 58 (2000).

The Court held that despite ignoring the employee's tearful pleas to postpone the review because of his mental weakness, the employer's conduct was not extreme or outrageous. *See id.* at 59-60.

In her response to Effingham Hospital's motion, Couick points only to the circumstances surrounding her separation. *See* Doc. 47 at 16-22. She complains that Barrs fired her while Couick was ill and that Effingham Hospital failed to respond to her recent complaint about Barrs. *See id.*

Contrary to Couick's claim, Effingham Hospital did respond to her complaints about Barrs by holding a meeting between Couick, Barrs, and Kicklighter which ended with Couick asking for a hug from Barrs. *See* Doc. 42-2 at 173-74 (Couick Dep.). As to Barrs's alleged firing of Couick while she had the flu, nothing approached even the insufficiently outrageous facts in *Jarrard*. While Barrs did tell Couick she would have to "suck it up" and remain at work, she did not say anything negative about her. *See* Doc. 42-2 at 92-94.

Effingham Hospital argues that even accepting Couick's deposition testimony as true, summary judgment is appropriate. *See* Doc. 42 at 19. *But see West v. Higgins*, 346 F. App'x 423, 425 (11th Cir. 2009) ("Conclusory, uncorrobroated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion.")

In her deposition, Couick testified that she bases her claim on Barrs: (1) denying her FMLA leave request, (2) berating Couick three times about paid time off

9

issues, (3) leaving Couick off a list for ordering jackets, (4) sending one or two emails in "all caps," (5) failing to notify Couick of educational courses, and (6) asking Couick, "do you not know how to spell my name?" *See* Doc. 42-2 at 168-70 (Couick Dep.).

Barrs's denial of Couick's leave request did not interfere with Couick's FMLA rights because Couick did not put Effingham Hospital on proper notice. *See* Doc. 32 at 2-3; *see also Miraliakbari v. Pennicooke*, 254 Ga. App. 156 (2002) (interference with FMLA leave insufficient).

Harsh words from a supervisor are a recognized aspect of employment. Such common occurrences are not actionable. *See Jarrard*, 242 Ga. App. at 59; *Kornegay*, 190 Ga. App. at 435. "Berating" Couick three times, emailing her in "all caps," and scolding her about spelling are not sufficiently extreme or outrageous and do not amount to a pattern of abusive behavior. *Cf. Anderson*, 190 Ga. App at 567.

"[S]loppy business practices . . . are not generally considered as going beyond all reasonable bounds of decency as to be utterly intolerable in a civilized society." *Jarrard*, 242 Ga. App. at 60. Neither Barrs's failure to order Couick a jacket, nor her failure to notify Couick about education courses is sufficient.

The Court denied Effingham Hospital's motion to dismiss this claim in part because Couick had properly alleged FMLA retaliation. *See* Doc. 32 at 6-7; *Yarbray v. S. Bell Tel. & Tel. Co.*, 261 Ga. 703, 706 (1991) (deliberate retaliation for filing discrimination suit can be outrageous). But Couick has failed to support that claim. For the same reasons cited above, this allegation does not save Couick's IIED claim.

Effingham Hospital's motion for summary judgment, *see* Doc. 39, is **GRANTED** with respect to Couick's IIED claim.

### C. Negligent Supervision & Retention

Negligent supervision and retention claims "are derivative and cannot survive without an underlying tort. *See Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1329 (N.D. Ga. 2009) (citing *MARTA v. Mosley*, 280 Ga. App. 486, 490 (2006)); *see also Ekokotu v. Boyle*, 294 F. App'x 523, 527 (11th Cir. 2008) (citing *Phinazee v. Interstate Nationalease, Inc.*, 237 Ga. App. 39, 41 (1999) ("[I]f the underlying claim fails, the plaintiff can not sustain the claim for negligent retention."). Because none of Couick's underlying claims survive summary judgment, Effingham Hospital's motion is **GRANTED** as to Count IV.

### VI. CONCLUSION

Couick's motion for partial summary judgment, *see* Doc. 34, is **DENIED**.

Effingham Hospital's motion for summary judgment, *see* Doc. 39, is **GRANTED**.

This 21st day of March 2011.

*/s/ B. Avant Edenfield*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

10